**LEVI & KORSINSKY, LLP**
Adam M. Apton (316506)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel.: (213) 985-7290
Email: aapton@zlk.com

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISLAM ABEED, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TOYOTA MOTOR CORPORATION, KOJI SATO, YOICHI MIYAZAKI, AKIO TOYODA, and KENTA KON<br><br>Defendants. | No. 2:24-cv-05284-FLA-MAA<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Prafulchandra Patel ("Lead Plaintiff") and additional plaintiffs Aziz Asaria and Akber Ali Asaria (collectively, "Additional Plaintiffs" and together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Toyota Motor Corporation ("Toyota", "TMC", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. <u>NATURE OF THE ACTION</u>

1. This is a federal securities class action lawsuit brought on behalf of all persons and entities who purchased or otherwise acquired publicly traded Toyota securities on domestic exchanges or in domestic transactions between April 28, 2023 and July 31, 2024, inclusive (the "Class Period"), and were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission (the "SEC").

2. In 2009, Toyota found itself at the center of a recall crisis following years of aggressive growth and cost-cutting initiatives resulting in the severe deterioration of the Company's product quality. When testifying before Congress

in 2010, Toyota's CEO and President, Akio Toyoda, personally committed to making a change, placing the highest priority on improving quality over quantity.

3. Thereafter, Toyota described its global vision as "making the highest-quality vehicles in the world," touting its vehicles as "[t]he safest and most responsible ways of moving people." The Company's efforts to rebuild its public image and customer trust paid off. For instance, in 2023, Toyota received the most safety awards from Forbes of any car manufacturer. During the Class Period, Toyota securities reached as high as $255 per share.

4. However, unbeknownst to investors and the public at large, for more than a decade before the Class Period began, Toyota and its subsidiaries engaged in a widespread practice of falsifying vehicle certification tests—including tests of quality, performance, and safety—mandated by the Japanese Ministry of Land, Infrastructure, Transport and Tourism (the "MLIT"). Consequently, when the Company announced that an undisclosed MLIT-ordered investigation uncovered serious test falsification throughout Toyota's corporate structure, and ultimately resulted in Toyota's receipt of its first ever "Correction Order" from the agency, the price of Toyota ADSs collapsed.

5. In early 2022 and at the start of the Class Period, on April 28, 2023, Toyota announced that two of its subsidiaries, Hino Motors, Ltd. and Daihatsu Motor Co., Ltd., respectively, had engaged in testing certification misconduct. Both subsidiaries had falsified data submitted to the MLIT. These problems were significant, but the vehicles manufactured by these subsidiaries collectively accounted for a small minority of Toyota's total sales. The far more serious question for investors was whether misconduct was limited to these subsidiaries or if it pervaded Toyota's corporate structure, including Toyota itself.

6. As such, Defendants set about convincing the markets that Toyota was thoroughly investigating the problem. On April 28, 2023, calling back to his early promise that "Toyota would not run away, lie, or distort truth," Defendant Toyoda called the identification of safety-related testing misconduct at Daihatsu "an absolutely unacceptable act" and vowed to conduct a thorough investigation into the manufacturing operations and regulatory compliance for the "Toyota Group as a whole," which includes Toyota itself and its subsidiaries.

7. On June 30, 2023, Toyota reiterated its "commitment to facing manufacturing with sincerity" claiming that top management from Toyota and its subsidiaries met on May 12, 2023 to "renew[] our recognition of this goal" and "are currently working … to re-examine our past governance structure, including our own, and have begun a thorough review."

8. Nine months later, on January 30, 2024, following the Company's announcement of testing misconduct identified at a third Toyota subsidiary, Toyota Industries Corporation, Defendant Toyoda responded to an analyst's inquiry about the potential for other misconduct within the Toyota group by declaring that "[a]s far as I know, there are no other irregularities." Unfortunately for investors, Defendants' Class Period statements were false.

9. Contrary to their representations, Defendants had not started a voluntary investigation into Toyota's operations and compliance in May 2023. Instead, they waited until February 2024, and only after the Company was ordered to do so by the MLIT following the discovery of certification issues at multiple Toyota subsidiaries. Accordingly, Defendants' statements gave the false impression that, during the Class Period, the entire Toyota group, including Toyota itself, had been properly investigated, and no other malfeasance existed.

10. On June 3, 2024, the truth began to leak out when the Company announced that it had discovered falsified crash test data for seven different models manufactured by Toyota. That same day, the Company held a press conference during which Defendant Toyoda admitted that they had only begun investigating Toyota after they were ordered to do so by the MLIT on January 26, 2024.

11. On this news, the price of Toyota ADSs fell by $9.18 per share, or 4.22% over the following three trading days, to close at $208.33 per share on June 5, 2024.

12. On July 5, 2024, Toyota claimed that it had completed its investigation and had found no further misconduct. But then, on July 31, 2024, Toyota disclosed that the Japanese government itself had uncovered improper certifications with seven additional models that Toyota had not previously disclosed, resulting in the Company's receipt of a Correction Order.

13. On this news, the price of Toyota ADSs fell by $20.53 per share, or 10.61%, over two trading days to close at $173.02 per share on August 2, 2024.

14. For years, Toyota's entire corporate structure falsified test results to obtain government certifications. When early warning signs of this egregious misconduct came to light, Defendants told investors that Toyota was doing exactly what a responsible corporate citizen would do: investigating the problem, root and branch. Defendants' claims, however, were not true, and their later assertions of being unaware of any further misconduct within the Toyota group were at best misleading. Investors suffered the consequences when Defendants were forced to reveal they had not properly investigated Toyota, that a previously concealed government-ordered investigation had uncovered misconduct at Toyota, and that the government itself had found additional misconduct after Toyota cleared itself.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

18. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange markets.

## III. THE PARTIES

### A. Plaintiffs

19. Lead Plaintiff, as set forth in his previously filed certification, declaration, and brokerage statements (ECF Nos. 14-3, 14-6, 26-2), incorporated by reference herein, purchased Toyota securities in domestic transactions on domestic exchanges through a United States based broker during the Class Period and was economically damaged thereby.

20. Plaintiff Aziz Asaria, as set forth in his previously filed certification (ECF No. 18-2), incorporated by reference herein, purchased Toyota securities during the Class Period and was economically damaged thereby. He purchased

those securities in domestic transactions on domestic exchanges through a United States based broker.

21. Plaintiff Akber Ali Asaria, as set forth in his previously filed certification (ECF No. 18-2), incorporated by reference herein, purchased Toyota securities during the Class Period and was economically damaged thereby. He purchased those securities in domestic transactions on domestic exchanges through a United States based broker.

**B. <u>Defendants</u>**

22. Defendant Toyota is a Japanese car company. Toyota is incorporated in Japan and its head office located at 1 Toyota-cho, Toyota City, Aichi Prefecture 471-8571, Japan. Its American headquarters are located at 6565 Headquarters Drive, Plano, Texas 75024. Toyota has offices at 1630 W. 186th St. Gardena, California 90248-3807.

23. Since September 29, 1999, Toyota ADSs have been traded and listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "TM", through a sponsored ADS facility operated by The Bank of New York Mellon, acting as the depositary. The Bank of New York Mellon at all relevant times maintained its principal executive offices at 240 Greenwich Street, New York, New York 10286. Prior to that time, Toyota's ADSs were listed on the Nasdaq SmallCap Market through five unsponsored ADS facilities.

24. ADRs are negotiable instruments issued by a depositary bank, representing ownership of the underlying ADSs.

25. Defendant Koji Sato ("Sato") has served as the Company's Chief Executive Officer ("CEO") and President since April 2023 and, at all relevant times, has served as a member of the Board of Directors. He first joined Toyota in April 1992, starting in the Technology Administration Division. He moved to the Lexus

division in 2006. In January 2020, Sato became President of Lexus International, and in September of the same year, he took on the role of President of GAZOO Racing Company. He was appointed Chief Branding Officer of Toyota in January 2021.

26. Defendant Yoichi Miyazaki ("Miyazaki") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since April 2023 and, at all relevant times, has served as a member of the Board. At all relevant times, Miyazaki has also served as the Company's Chief Competitive Officer and President of Business Planning & Operation. He first joined Toyota in 1986; was promoted to Managing Officer in 2015; and Operating Officer in 2019.

27. Defendant Akio Toyoda ("Toyoda") has served as the Chairman of the Company's Board of Directors since April 2023. He first joined Toyota in 1984; became a member of the Board in 2000; and President and CEO in 2009, a position he held until April 2023 when he transitioned to Chairman. Concurrently, Toyoda also served as Chairman and CEO of Toyota Motor North America, Inc.; Chairman of TOYOTA FUDOSAN CO., LTD.; and Chairman of the Japan Automobile Manufacturers Association, Inc.

28. Defendants Sato, Miyazaki, and Toyoda are collectively referred to herein as the "Individual Defendants."

29. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

30. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Toyota's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

31. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles

of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

32. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Toyota under *respondeat superior* and agency principles.

33. Defendant Toyota and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. SIGNIFICANT NON-PARTIES

34. Hino Motors, Ltd. ("Hino") is a Japanese manufacturer of commercial vehicles and diesel engines, originating in 1910 as part of the Tokyo Gas Industry Company. In 2001, Toyota acquired a majority stake in Hino.

35. Daihatsu Motor Co., Ltd. ("Daihatsu") is a Japanese automobile manufacturer founded in 1907 as Hatsudoki Seizo Company, Ltd. in Osaka. The company officially adopted the name Daihatsu in 1951 and produces small cars, trucks, and utility vehicles. Daihatsu's relationship with Toyota Motor Corporation began in 1967 through a business alliance. Toyota gradually increased its stake in Daihatsu over the years, acquiring 16.8% of shares in 1995, which was then raised to 51.2% in 1998, making Daihatsu a subsidiary. In August 2016, Daihatsu became a wholly-owned subsidiary of Toyota through a share exchange.

36. Toyota Industries Corporation ("Toyota Industries" or "TICO"), was founded in 1926 to manufacture and sell automatic looms, has evolved into a diversified manufacturer with operations in textile machinery, automobiles, materials handling equipment, and electronics. The company has a long-standing relationship with Toyota. As of January 2025, Toyota holds a 22.74% stake in Toyota Industries, making it the largest shareholder. Toyota Industries, in turn, owns 7.55% of TMC's shares.

37. In its public filings with the SEC, Toyota uses the phrase "Toyota Group" to refer collectively to Toyota Motor Corporation, Toyota Industries Corporation, Aichi Steel Corporation, JTEKT CORPORATION, Toyota Auto Body Co., Ltd., Toyota Tsusho Corporation, AISIN CORPORATION, DENSO Corporation, TOYOTA BOSHOKU CORPORATION, TOYOTA FUDOSAN CO., LTD., TOYOTA CENTRAL R&D LABS., INC., Toyota Motor East Japan, Inc., Toyoda Gosei Co., Ltd., Hino Motors, Ltd., Daihatsu Motor Co., Ltd., Toyota Housing Corporation, Toyota Motor Kyushu, Inc. and Woven by Toyota, Inc.

## V. SUBSTANTIVE ALLEGATIONS

### A. Company Background

38. Originally founded as a spinoff of Toyota Industries, Toyota began manufacturing engines and then cars beginning in the 1930s. From the time it entered the U.S. market in the 1950s, it had cultivated a reputation for making safe and reliable cars.

39. Beginning in 2000, Toyota shifted its focus from quality and safety to increasing its market share and profitability, launching a program known as "Construction of Cost Competitiveness for the 21st Century," with the goal of cutting the costs of 180 key vehicle parts by 30 percent, saving nearly $10 billion by 2005. In 2002, Toyota launched an aggressive growth campaign, expanding its product line and geographic reach while simultaneously imposing even more severe cost-cutting measures. Toyota executives pledged to expand the Company's manufacturing capacity by 25 percent and to secure 15 percent of the global auto industry by 2010, surpassing General Motors as the world's largest automaker.

40. Toyota's global expansion and cost-reduction programs proved successful. In 2008, Toyota overtook General Motors to become the largest automotive manufacturer in the world by sales and production. However, Toyota's

aggressive growth and cost-cutting also caused significant deterioration in product quality, including unintended acceleration problems.

41. Since 2000, the National Highway Traffic Safety Administration ("NHTSA") has received more than 3,000 complaints of unintended acceleration in Toyota vehicles, including serious accidents resulting in nearly 40 fatalities. Unintended acceleration problems were so pronounced that the auto insurer State Farm alone recorded over 900 such incidents involving Toyota vehicles.

42. The Company's deteriorating quality resulting in serious safety concerns led to Defendant Toyoda testifying in front of U.S. Congress' Committee on Oversight and Government Reform in 2010. During the hearing, Defendant Toyoda admitted that "Toyota has, for the past few years, been expanding its business rapidly. Quite frankly, I fear the pace at which we have grown may have been too quick." That said, Toyoda reassured Congress that, since taking control of the Company in 2009, he had "personally placed the highest priority on improving quality over quantity, and I have shared that direction with our stakeholders."

43. Toyota continued to reassure investors that the safety and reliability of its cars had not flagged. As Adam Bragman, an automotive analyst for HIS Global Insight told CBS News in a November 25, 2009 article, Toyota's reputation for quality is "the central pillar that they've built their business on."

44. Toyota frequently touted its commitment to safety to investors. For instance, before the Class Period, in its annual report filed with the SEC on June 24, 2020, Toyota described its global vision, touting its vehicles as "[t]he safest and most responsible ways of moving people" and declaring that "[s]afety is Toyota's highest priority, and Toyota will continue to provide world-class safety." As the Harbard Business Review described in its July-August 2007 article, "[i]t's critical for Toyota to keep making the highest-quality vehicles in the world."

45. Toyota's PR offensive produced results. In 2023, for instance, Toyota received the most safety awards from Forbes of any car manufacturer, according to a Forbes article dated February 23, 2023 titled *The Safest Cars For 2023 – Toyota, Honda And Mazda Top Rankings*.

**B. Early Warning Signs of Toyota's Falsified Certifications Scandal**

46. Notwithstanding Defendant Toyoda's public promise to improve the Company's emphasis on quality over quantity, Toyota's reputation for quality has taken a serious hit over the past three years. A series of scandals linked to three separate Toyota subsidiaries, and ultimately the Company itself, came to light revealing that the Toyota Group has been falsifying certification tests in Japan, that went undetected for decades.

47. According to Toyota, "[c]ertification consists of having the national authorities inspect and confirm in advance that vehicles meet various standards so that customers can drive their vehicles with peace of mind. We consider the appropriate acquisition of certification to be a major prerequisite for doing business as an automobile manufacturer."

48. In Japan, a certification test primarily focuses on the safety, quality, and performance of the vehicle. Manufacturers may not produce and sell vehicles which are not certified.

49. On March 4, 2022, before the Class Period began, the Company announced that Hino had found that employees falsified engine performance data in government-mandated tests with respect to three different engine models. Specifically, Hino "identified misconduct concerning the falsification of engine performance data in its emissions durability testing for the A05C (HC-SCR) medium duty engine, and in the measurement of fuel economy performance in certification tests for two heavy duty engine models, A09C and E13C." Toyota also

disclosed that Hino had "confirmed that those engines have problems in engine performance." As a result, Hino suspended sales of those three engine models. The public's reaction was muted, however, because Hino only accounts for only a small part of the Toyota Group's sales.

50. On June 23, 2022, Toyota filed a current report on Form 6-K with the SEC providing, as an exhibit, the English translation of the Company's amended report on corporate governance. The report provided, in pertinent part, that:

> TMC lays out its guiding principles and code of conduct and shares business principles with its subsidiaries, including listed subsidiaries. At the same time, TMC exchanges people and information with those subsidiaries. Any material management matters of the subsidiaries must be approved in advance by or reported to TMC in accordance with rules agreed upon by TMC and each subsidiary. Through these measures, TMC ensures the effectiveness of the governance system of its corporate group.

51. In the report, Toyota also acknowledged Hino's recently announced identification of "past misconduct in relation to its applications for certification" providing assurances that the Company's subsidiary had formed a Special Investigation Committee "commissioned with conducting investigation to clarify the extent of the identified issues and an in-depth analysis into the root causes." Toyota declared that "[w]e will work to uncover all pertinent details as quickly as possible. … The Toyota group believes legal compliance is the foundation of management. We will spare no efforts to regain the trust of customers and to prevent recurrence."

52. Then, in August 2022, Hino admitted that it had falsified data going as far back as 2003. This revelation led to the resignation of three executives overseeing Hino's production and compliance and another official in charge of its technology development.

**C. <u>Defendants Conceal Their Failure to Properly Investigate Toyota</u>**

53. The scandal grew when, on April 28, 2023, the first day of the Class Period, Toyota announced that Daihatsu had also engaged in testing misconduct, in an attachment to a Form 6-K filed with the SEC. The announcement stated that "our consolidated subsidiary, Daihatsu Motor Co., Ltd., has been found to have committed wrongdoing" and included a Daihatsu press release confirming that "it has committed wrongdoings in approval application for side collision tests for vehicles (4 models) developed by Daihatsu destined for overseas markets."

54. In that same press release, Defendant Toyoda acknowledged that "[s]ince this problem occurred with a Toyota brand passenger car, we believe that the problem is not limited to Daihatsu." He went on to state that Toyota was doing everything it could do identify and address the problems: "We will begin by conducting a detailed investigation and thoroughly collecting facts to understand the situation, determine the true cause, and work diligently to prevent a recurrence." Further, Toyoda committed to "inform[ing] the public in a timely manner regarding the facts we learn through our investigations," adding that "[a]s the top executive officer, President Sato will take responsibility for improving the car manufacturing operations of Toyota and the group companies, while I, as the Chairman of the Board and with my recall issue experience, will lead initiatives for governance and compliance." He concluded by claiming that "The Toyota Group as a whole will do its utmost to regain the trust of our customers as soon as possible."

55. Defendants continued to falsely reassure investors that they were investigating the entire Toyota Group, including Toyota itself, in the Company's annual report filed with the SEC on June 30, 2023. In that report, Defendants stated, in discussing the Daihatsu certification misconduct, that "[o]n May 12, 2023, the top management of each group company gathered to discuss Toyota's commitment

to facing manufacturing with sincerity and renewed our recognition of this goal. We are currently working with all of our group companies to re-examine our past governance structure, *including our own*, and have begun a thorough review." (emphasis added).

56. Similarly, on January 29, 2024, Toyota disclosed further misconduct, this time at its Toyota Industries subsidiary. In an exhibit attached to a current report filed with the SEC on Form 6-K, the Company provided, in pertinent part:

> The investigation found that irregularities occurred during the horsepower output testing for the certification of three diesel engine models for automobiles that Toyota had commissioned to TICO. During certification testing, the horsepower output performance of engines was measured using ECUs with software that differed from that used for mass production so that results could measure to make values appear smoother with less variation. Ten vehicle models are using the affected engines globally, including six in Japan.

57. Based on the results of the investigation, identifying certification irregularities at Toyota Industries, Toyota suspended all shipments of the affected engines. Toyota again confirmed that it was fully investigating the misconduct and cooperating with authorities: "Going forward, we will provide detailed explanations to the authorities and promptly proceed with appropriate measures, including conducting testing in the presence of witnesses if appropriate."

58. The next day, Defendant Toyoda gave a press conference, discussing the repeated reports of misconduct at Toyota's subsidiaries. When specifically asked if, given all of the revelations of misconduct, the public could expect more to come, Toyoda stated "[a]s far as I know, there are no other irregularities."

59. The vehicles manufactured by Toyota itself account for a significant majority of the Toyota Group's sales, with Toyota and Lexus branded cars accounting for more than 91% of Toyota Group's sales by number of vehicles sold in 2023. Moreover, as the Toyota Group's beating heart, the Company has

considerably more importance and prestige than its subsidiaries. As such, any investigation of misconduct that does not examine the parent's own activities is deficient. Toyota implicitly acknowledged this reality when it assured investors that its investigation would reach its activities as well as its subsidiaries, and investors understood that to be the case when relying on Defendants' statements below.

60. Defendants' Class Period statements describing an investigation into the manufacturing operations and regulatory compliance at Toyota, however, were outright false. Defendants had studiously avoided looking into the Company's activities. As later revealed, they had to be dragged into conducting an investigation. Indeed, on January 26, 2024, the MLIT ordered Toyota to investigate its own activities for possible testing misconduct following the repeated findings of pervasive and long-standing misconduct at its numerous subsidiaries. As later admitted, Defendants kicked off their investigation into Toyota's activities in February 2024—days *after* Defendant Toyoda's press conference declaring no knowledge of additional irregularities at the Company.

61. Defendants' statements concealed their failure to properly review Toyota's prior activities despite explicit assurances that a thorough investigation was underway, resulting in an undisclosed government-order to do so. Defendants' later assurances that they were unaware of any further misconduct at the Company misled investors by providing the false impression that at what appeared to be the end of a purportedly lengthy investigation no other malfeasance existed.

**D. <u>The Truth Emerges</u>**

62. On June 3, 2024, Toyota issued a press release revealing that, in addition to the fraudulent certifications at Hino, Daihatsu, and Toyota Industries, "seven models, including some that have already been discontinued since 2014, were tested using methods that differed from the government standards, and we

reported this to MLIT on May 31." The announcement continued disclosing that "considering these findings, we have taken action to temporarily halt shipments and sales of three models currently produced in Japan (Corolla Fielder, Corolla Axio, and Yaris Cross), effective today." The Company explained that the investigation into Toyota's activities was still in progress and claimed that it "will continue to provide detailed explanations to the authorities and expedite appropriate measures, including conducting testing in the presence of witnesses."

63. That same day, Defendant Toyoda held a press conference in which he admitted that the investigation into Toyota did not begin until after January 30, 2024. He stated that "after the press conference on January 30th of this year my immediate action was to ensure that everybody involved including myself correctly understood the problem. Therefore, in February I took the lead and called on Toyota, Hino, Daihatsu, and Toyota Industries to hold the TPS [Toyota Production System] Jishuken[1] or joint Kaizen[2] activities for certification work. First we focused on the processes in which certification related work was most prone to problems."

64. Later in the press conference, in response to a reporter's question asking why it took so long to discover irregularities at Toyota given that irregularities in multiple companies within the Toyota Group had been discovered, Toyota's Customer First Promotion Group Chief Officer Shinji Miyamoto responded by saying, "the MLIT gave us an instruction on January 26."

65. On this news, the price of Toyota ADSs fell by $9.18 per share, or 4.22% over the following three trading days, to close at $208.33 per share on June 5, 2024.

---

[1] Jishuken is a Japanese business term of art that literally means "self learning" and refers to an internal hands on investigation and improvement process.

[2] Kaizen is a Japanese business term of art that refers to "continuous improvement."

66. It did not take long for Toyota to try and clear itself of any additional wrongdoing. On July 5, 2024, Toyota announced that its internal investigation had been completed with no further findings of misconduct. Markets breathed a sigh of relief.

67. But then, on July 30, 2024, Toyota was forced to reveal the full truth about the investigation and the extent of its misconduct. That day, Toyota revealed that the MLIT had been conducting its own investigation into Toyota's misconduct. Worse yet, Toyota admitted that the government had found additional misconduct that Toyota had not previously disclosed. As a result, Toyota reported that the MLIT had issued Toyota a Correction Order, its first ever in Company history. The Correction Order came with instructions to implement "drastic reforms" to ensure proper certification practices.

68. On this news, the price of Toyota ADSs fell by $20.53 per share, or 10.61%, over the following two trading days, to close at $173.02 per share on August 2, 2024.

69. After the Class Period ended, on August 9, 2024, Toyota issued an "Announcement on Submission of Report to Prevent Recurrence" as an exhibit to a current report on filed with the SEC on Form 6-K stating, in pertinent part, that "[w]ith the suggestions by the MLIT, Toyota has recognized that management was not sufficiently involved in the certification operations, and there were many areas for improvement in the foundation of certification operation, such as the data management system and the establishment of regulations and procedures for the certification operations." Toyota went on to promise that it "will review the mechanisms and systems to implement the proper certification operations, notice something abnormal, and take action promptly through the joint effort between the management and those on-site."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

70. On April 28, 2023, the Company filed with the SEC a press release as an attachment to a current report on Form 6-K that included the following statement from Defendant Toyoda:

> **Chairman Toyoda Comments on Daihatsu's Announcement of Side Impact Test Wrongdoing**
>
> It has come to light that Daihatsu Motor Co., Ltd. (Daihatsu) has been found to have committed wrongdoing in the side impact test of its vehicles for overseas markets. We sincerely apologize for the inconvenience and concern this may cause to our customers, dealers, and other concerned parties who are currently using these vehicles.
>
> Comments from Akio Toyoda, Toyota Chairman of the Board
>
> Daihatsu Motor Co., Ltd.'s wrongdoing is a matter that concerns safety, which is the most important aspect of vehicles. We consider this an absolutely unacceptable act that betrays the trust of our customers. We would like to sincerely apologize to our customers around the world and all related parties for the inconvenience and concern this has caused.
>
> ***Since this problem occurred with a Toyota brand passenger car, we believe that the problem is not limited to Daihatsu. We will begin by conducting a detailed investigation and thoroughly collecting facts to understand the situation, determine the true cause, and work diligently to prevent a recurrence.***
>
> We will also inform the public in a timely manner regarding the facts we learn through our investigations.
>
> I personally promised our customers that Toyota would not run away, lie, or distort the truth during the recall crisis in 2009. Nevertheless, we find it to be a serious matter that such a problem has occurred at one of our group companies.

> ***As the top executive officer, President Sato will take responsibility for improving the car manufacturing operations of Toyota and the group companies, while I, as the Chairman of the Board and with my recall issue experience, will lead initiatives for governance and compliance. The Toyota Group as a whole will do its utmost to regain the trust of our customers as soon as possible.***

(Emphasis added).

71. The statements identified in the preceding paragraph are materially false and misleading because although Toyoda told investors that Defendants would be "conducting a detailed investigation" and "thoroughly collecting facts to understand the situation," the investigation did not examine conduct occurring within Toyota itself which, as discussed above, accounted for 91% of the Toyota Group's sales. In fact, Defendants did not examine conduct occurring within Toyota until February 2024, after the MLIT forced them to do so on January 26, 2024. Thus, Defendants' "detailed investigation" was materially different and less thorough than investors were led to believe. Investors understood Defendants' statements to mean that the "detailed investigation" would include an examination of Toyota's conduct when, in reality, it did not.

72. The statements identified above are also materially false and misleading because Akio Toyoda was not, at that time, leading governance and compliance initiatives at the parent company. As admitted on June 3, 2024, Toyoda only "took the lead" of the investigation in February 2024. Consequently, Toyoda falsely represented his role in the investigation when speaking to the public in the above identified statements.

73. Collectively, the above statements falsely assured investors that any existing relevant misconduct would be identified and appropriately addressed. This was not the case though. To the contrary, Defendants were not conducting an investigation in line with what they described and, consequently, created and

concealed an acute risk that additional misconduct within Toyota would continue and ultimately impact the Company in a negative manner by, *inter alia*, additional adverse regulatory findings.

74. On June 30, 2023, Toyota filed with the SEC its annual report for the fiscal year ended March 31, 2023 on Form 20-F (the "Annual Report"). Attached to the Annual Report were certifications pursuant to SOX signed by Defendants Sato and Miyazaki attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

75. When discussing the "Misconduct of Hino and Daihatsu in Relation to their Applications for Certification," the Annual Report provided the following:

> On March 4, 2022, Hino, a consolidated subsidiary of Toyota, announced that it identified past misconduct in relation to its applications for certification concerning emissions and the fuel economy performance of its vehicle engines for the Japanese market. Hino subsequently received an investigation report from a special investigation committee consisting of outside experts concerning this matter. Hino also was subject to an on-site inspection from the Ministry of Land, Infrastructure, Transport and Tourism ("MLIT"), and received a corrective action order from it. On October 7, 2022, Hino submitted a recurrence prevention report to MLIT. To clarify management responsibility regarding this matter, Hino decided to have four persons who were directors or senior managing officers resign, reduce the remuneration of directors, and request the voluntary return of part of the remuneration of certain past representative directors. Further, Hino formulated and announced "Three Reforms," namely reforms to management, corporate culture and vehicle manufacturing, to prevent future misconduct. Hino is committed to addressing this issue head on and living out with renewed intent its corporate mission: "We make a better world and future by helping people and goods get where they need to go." See "Item 4. Information on the Company — 4.B Business Overview — Legal Proceedings" for a discussion of related legal proceedings, including government investigations and actions.

Furthermore, on April 28, 2023, Daihatsu announced and disclosed that it had committed procedural irregularities in approval applications for side collision tests for vehicles developed by Daihatsu destined for overseas markets. During the subsequent in-house inspection, it was newly discovered and announced that Daihatsu identified irregularities in the certification procedures for the side impact collision tests of Daihatsu ROCKY HEVs and Toyota RAIZE HEVs. The irregularities were promptly reported to, and consultations were undertaken, with the inspection and certification authorities after they were discovered, and shipments and sales of the vehicles at issue were suspended in the countries in which approval had been granted. In addition, Daihatsu has confirmed and reported that the vehicles at issue conform to laws and regulations in in-house re-tests using proper parts. Daihatsu has established a third-party committee consisting of external experts in legal and technical matters to fully clarify the nature of the irregularities and identify their root cause; it has also asked the committee to recommend measures to prevent the recurrence of similar irregularities by examining the company's organization and development processes.

In the wake of the large-scale recalls that occurred in 2009, Toyota promised its customers around the world that it would not "run away, hide, or lie." Given this, we take very seriously the fact that these problems nevertheless occurred in our group. ***For this matter, as the chief executive officer, Toyota's President will further strive to improve the car manufacturing operations of Toyota and the group companies, while the Chairman of the Board of Toyota will lead initiatives to strengthen governance and compliance.***

***On May 12, 2023, the top management of each group company gathered to discuss Toyota's commitment to facing manufacturing with sincerity and renewed our recognition of this goal. We are currently working with all of our group companies to re-examine our past governance structure, including our own, and have begun a thorough review.*** We view this case not as an individual or workplace issue, but rather a company-wide issue where an individual or workplace was forced to commit a wrongdoing. Together with Daihatsu, we are committed to listening to the voices of those on the front lines and carefully responding to the situation.

> At Toyota worksites, everyone is committed to making better cars. Toyota is a company where, when a problem occurs, everyone always stops, pursues the root cause by going and seeing the location or process where the problem exists, makes improvements, and works to prevent recurrence. This is the Toyota philosophy that has been cherished since the company's founding. ***We believe that there is no other way to regain the trust of our customers than for all of Toyota and its group companies to return to this philosophy once again, for each group company's top management to confront the problems at their respective workplaces, uncover them, and make improvements one by one, and continue this steady effort. The entire Toyota group will work together to regain trust of our customers as soon as possible***.

(Emphasis added).

76. The statements identified in the preceding paragraph are materially false and misleading because Defendants were not investigating potential misconduct at Toyota, which accounted for the majority of the Toyota Group's sales. Defendants only commenced investigation efforts into Toyota in February 2024, after the MLIT forced them to do. Consequently, although the above statements from Toyota's annual report led investors to believe that Defendants were thoroughly examining the issues of potential misconduct, in truth Defendants' investigation was materially less thorough than represented because it did not include any investigation into Toyota itself.

77. The statements identified above are also materially false and misleading because Akio Toyoda was not, at that time, leading governance and compliance initiatives at the parent company. As admitted on January 30, 2024, Toyoda only "took the lead" of the investigation in February 2024. Consequently, Defendants falsely represented his role in the investigation when speaking to the public in the above identified statements.

78. Collectively, the above identified statements falsely assured investors that relevant misconduct would be identified and appropriately addressed. This was

not the case though. To the contrary, Defendants were not conducting an investigation in line with what they described and, consequently, created and concealed an acute risk that additional misconduct within Toyota would continue and ultimately impact the Company in a negative manner by, *inter alia*, additional adverse regulatory findings.

79. On January 30, 2024, Toyota posted an English-language translation of a press conference conducted by Defendant Toyoda. During the conference, Toyoda engaged in the following exchange:

> <Q: Unknown Analyst> Following successive irregularities at Hino, Daihatsu, and Toyota Industries Corporation, many people suspect there may be other misconduct within the Group. Every report notes that people were unable to speak up even if they noticed the irregularities. It would be appreciated if you asked anyone who is currently aware of misconduct to come forward immediately. Also, in presenting your vision and taking responsibility for the Group, what goals do you have in mind?
>
> <A: Akio Toyoda> ***As far as I know, there are no other irregularities***.
>
> (Emphasis added).

80. The statement identified in the preceding paragraph is materially false and misleading because additional "irregularities" existed and, as such, Toyoda's statement recklessly disregarded the risk of misleading investors. Toyoda qualified his response by saying "[a]s far as I know," which implied to investors that he had personal knowledge over the investigation into the "irregularities" at hand. In truth, Toyota's investigation to date did not include any examination into Toyota itself and Toyoda to date had not been in control of the investigation or otherwise "involved" sufficiently to have understood the full extent of the problem. Thus, although Toyoda's statement above provided confidence and assurance to investors that the "irregularities" were limited to what had already been disclosed, the

misconduct was not limited to the various subsidiaries already identified and Toyoda had no basis for saying that it was.

81. Additionally, Toyoda's statement above created and concealed an acute risk that additional misconduct within Toyota would continue and ultimately impact the Company in a negative manner by, *inter alia*, additional adverse regulatory findings. Indeed, Toyoda had not been involved sufficiently in the ongoing investigations and therefore had no basis for confirming to investors that the "irregularities" were limited in scope to the subsidiaries already identified publicly. Further, at the time of his statement above, the investigation had not examined conduct at Toyota itself. Consequently, Toyoda's statement falsely minimized the risk of further adverse regulatory action.

## VII. LOSS CAUSATION AND ECONOMIC LOSS

82. During the Class Period, Toyota securities traded publicly on domestic exchanges, including the NYSE. The market for Toyota securities was open, well-developed and efficient at all relevant times.

83. Throughout the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Toyota's securities and operated as a fraud or deceit on Class Period purchasers and/or acquirers of Toyota's securities by materially misleading the investing public. By issuing materially false and misleading statements detailed herein, Defendants presented a false and/or misleading picture of Toyota's business and operations. Defendants' false and misleading statements alleged herein had the intended effect and caused Toyota's securities to trade at artificially inflated levels throughout the Class Period, with Toyota securities reaching as high as $255 per share.

84. Reasonably relying on the integrity of the market price of Toyota securities and market information relating to Toyota's business and operations,

Plaintiffs and other members of the Class purchased or otherwise acquired Toyota securities at artificially inflated prices during the Class Period. When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Toyota's securities materially declined, as the prior artificial inflation dissipated. As a result of their purchases or acquisitions of Toyota's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, which were proximately caused by Defendants materially false and misleading statements made to the investing public.

85. Indeed, as described in detail below and highlighted above, when the truth about the Company leaked out through a series of partial corrective disclosures, the inflation that was a direct result of Defendants' Class Period misrepresentations and fraudulent conduct was eliminated as Toyota's securities reacted to information in the market.

86. On June 3, 2024, before the market opened, Toyota filed with the SEC a current report on Form 6-K. Attached to this current report was an English translation of an announcement that Toyota had filed with the Tokyo Stock Exchange on June 3, 2024. The announcement stated the following:

> Toyota Motor Corporation (Toyota) ***investigated its model certification applications as per instructions from the Ministry of Land, Infrastructure, Transport and Tourism (MLIT) on January 26 this year***. Although the investigation is still in progress, seven models, including some that have already been discontinued since 2014, were tested using methods that differed from the government standards, and we reported this to MLIT on May 31.
>
> The model certification applications in question involve inadequate data in pedestrian and occupant protection tests for three production models (Corolla Fielder/Axio and Yaris Cross) and errors in crash tests

> and other test methods for four discontinued models (Crown, Isis, Sienta, and RX).
>
> We sincerely apologize for any concern or inconvenience this may cause to our customers and stakeholders who have placed their trust in Toyota. ***We take it seriously that the problem was discovered at Toyota following the recent discovery of certification issues at Hino Motors, Ltd. and Daihatsu Motor Co., Ltd. and Toyota Industries Corporation***.
>
> Following comprehensive internal verifications on the affected vehicles, including those that are no longer in production, we can confirm that there are no performance issues that contravene laws and regulations. Therefore, there is no need to stop using the affected vehicles. However, considering these findings, we have taken action to temporarily halt shipments and sales of three models currently produced in Japan (Corolla Fielder, Corolla Axio, and Yaris Cross), effective today. We will continue to provide detailed explanations to the authorities and expedite appropriate measures, including conducting testing in the presence of witnesses.
>
> In January this year, we announced the Toyota Group Vision, 'Inventing our path forward, together.' We will continue to work on making 'ever-better cars' in a genba where employees have authority, which is a unique Toyota corporate culture.
>
> ***Again, we extend our sincere apologies to our customers and stakeholders***.
>
> (Emphasis added).

87. That same day, Defendant Toyoda conducted a press conference, informing the public for the first time that the investigation into Toyota did not begin until after January 30, 2024. Toyoda stated that "after the press conference on January 30th of this year my immediate action was to ensure that everybody involved including myself correctly understood the problem. Therefore, in February I took the lead and called on Toyota, Hino, Daihatsu, and Toyota Industries to hold

the TPS [Toyota Production System] Jishuken or joint Kaizen activities for certification work. First we focused on the processes in which certification related work was most prone to problems."

88. Later in the same press conference, in response to a reporter's question asking why there was a delay in identifying such irregularities at Toyota, given that irregularities in multiple companies within the Toyota Group had been discovered, Toyota's Customer First Promotion Group Chief Officer Shinji Miyamoto responded "the MLIT gave us an instruction on January 26."

89. On June 3, 2024, *The New York Times* published an article entitled "Toyota and Other Japanese Carmakers Say They Mishandled Safety Tests." The article claimed that "[t]he Japanese authorities had told the companies to conduct investigations into their compliance with national standards for safety and other issues." The article continued to provide, in pertinent part:

> Toyota Motor [. . .] and other top Japanese automakers said on Monday that internal investigations found they had mishandled vehicle testing on dozens of models over the past decade.
>
> ***Toyota said it had failed to gather proper data when doing pedestrian and occupant safety tests for three models, including its popular Yaris Cross sport utility vehicle***. [. . .]
>
> The automakers, which the Japanese government had told to open the investigations, said the testing failures would not affect the performance or safety of their vehicles and that customers could continue to use them normally. ***Still, Toyota said it would temporarily halt shipments of three of the affected models it produces in Japan***.
>
> The testing problems revealed Monday by Toyota [. . .] were conducted in Japan to meet the Japanese government's certification standards. The vehicles at issue were sold in Japan.
>
> The disclosures from Toyota and others add to a lengthening tally of testing and certification problems that Japanese automakers have faced

> in recent months — issues that people in the industry worry could affect consumer perceptions of the quality of Japanese cars.
>
> In December, an internal investigation at a Toyota subsidiary, Daihatsu Motor, revealed that most of its vehicles had not undergone proper collision-safety testing. The next month, another Toyota unit suspended all of its engine shipments after an investigation revealed that it had falsified figures concerning engine power.
>
> * * *
>
> But, Mr. Aoyama [a senior director at Fitch Ratings] said, "***there has long been a perception of the superior manufacturing and quality of Japanese products and with these instances of fraud appearing again and again, perceptions may be beginning to change***."
>
> In addition to the problems Toyota found involving three current models, ***it discovered errors in crash tests and other tests for four models it had discontinued***.
>
> * * *
>
> Mr. Toyoda said he was working with Toyota group companies to identify problems with internal certification processes and work structures, and had made several trips to visit their work sites himself. "We will carry out concrete improvements," he said.
>
> ***Japan's transport ministry said it would conduct an inspection at Toyota headquarters on Tuesday to follow up on the latest disclosures***.

(Emphasis added).

90. On the same day, the Associated Press published an article titled "Toyota apologizes for cheating on vehicle testing and halts production of three models" stating, in pertinent part:

> Toyota Chairman Akio Toyoda apologized Monday for massive cheating on certification tests for seven vehicle models as the automaker suspended production of three of them.

> ***The wide-ranging fraudulent testing at Japan's top automaker involved the use of inadequate or outdated data in collision tests, and incorrect testing of airbag inflation and rear-seat damage in crashes. Engine power tests were also found to have been falsified.***
>
> [Toyota] suspended production in the country of the Corolla Fielder, Corolla Axio and Yaris Cross. The deceptive tests were also found on discontinued models.
>
> * * *
>
> "We sincerely apologize," Toyoda told reporters, bowing deeply and holding the position for several seconds, as is customary in Japan at news conferences where companies apologize for misbehavior.

(Emphasis added).

91. On this news, the price of Toyota ADSs fell by $9.18 per share, or 4.22% over the following three trading days, to close at $208.33 per share on June 5, 2024.

92. Then, on July 31, 2024, Toyota disclosed, in an exhibit attached to a current report filed with the SEC on Form 6-K, that:

> Toyota Motor Corporation (Toyota) has been under on-site investigation and confirmation by the Ministry of Land, Infrastructure, Transport and Tourism (MLIT) since the announcement regarding model certification applications on June 3. As a result, today, we received a correction order from the MLIT, which urges us to make drastic reforms to ensure appropriate certification operations. We have also received suggestions and guidance on additional matters. It is with deep regret that we were not able to properly conduct our certification operations, and we apologize to our stakeholders for any concern or inconvenience this may have caused them.
>
> Through a series of suggestions and internal investigations, we believe that these incidents were caused by both on-site and management factors.
>
> 1. On-site factors

- Unclear internal operational rules for preparing documents required for certification application

- Insufficient clarification and management of resources required for the certification process

- Insufficient awareness of the importance of certification work

2. Managerial factors

- Lack of understanding and involvement of management/executives in the overall certification process

Based on the above understanding, we will review the structure and system to implement correct certification operations, clarify the responsibility and authority of the certification process once again, and continue to improve our infrastructure, including accurate data management. We will promptly compile these measures to prevent recurrence and report them to the MLIT.

Through the TPS Jishuken (Joint Kaizen Activities) for certification work, we will also strive to create a medium- to long-term structure and culture.

In addition to the cases reported on June 3, the MLIT indicated eight new cases involving seven vehicles through their on-site investigations, which were not certified in accordance with the prescribed procedures.

We will continue to take appropriate measures for all cases under the guidance of the MLIT.

The newly discovered cases have been reported to the relevant authorities, including the MLIT, and they are in the process of confirming compliance with the standards.

Customers do not need to stop using the vehicles immediately.

> The Corolla Fielder, Corolla Axio, and Yaris Cross for the domestic market, which have been suspended since June 3, are scheduled to resume production from the beginning of September after the MLIT confirms that they are in compliance with the standards.
>
> Furthermore, shipments of Noah/Voxy, which have been suspended since July 29 due to additional incidents, will resume as soon as they are ready.
>
> Once again, we sincerely apologize to our stakeholders for any concern or inconvenience this may have caused.

93. On this news, the price of Toyota ADSs fell by $20.53 per share, or 10.61%, over the following two trading days, to close at $173.02 per share on August 2, 2024.

94. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

95. Numerous facts alleged above, viewed collectively and holistically, raise a strong inference that the Individual Defendants knew or, at minimum, were reckless in disregarding the true facts regarding Toyota's certification misconduct and Defendants' misleading statements regarding the timing and scope of its investigation into that misconduct, and that each of the false and misleading statements set forth in Section VI, *supra*, were materially false and misleading and/or omitted material adverse facts. In addition to the allegations set forth above, the following facts further support a strong inference of scienter.

96. Further supporting an inference of each Individual Defendant's scienter is the fact that Toyota has systems in place to ensure that the Company's Board of Directors (including Defendants Toyoda, Sato, and Miyazaki) is fully informed of compliance related matters. In its April 10, 2023 report on corporate

governance, Toyota described the measures that its Board takes to ensure Directors' oversight of compliance, stating that:

> TMC has stipulated the fundamental provisions to be observed by Members of the Board of Directors and other executives in the 'Guiding Principles at Toyota,' the 'Toyota Code of Conduct,' the 'Code of Ethics,' etc., and all executives have been familiarized with these provisions. The relevant laws and regulations and the Articles of Incorporation that executives are to observe are listed in manuals to make all executives familiarized with those laws, regulations and rules and we conduct compliance education for newly appointed executives.
>
> …
>
> TMC deliberates on important topics pertaining to sustainability, corporate ethics, compliance and risk management as well as responses thereto at Sustainability Meetings or the Board of Directors' meetings, etc.

97. Toyota also described systems for retaining information relevant to Directors' duties such as compliance providing that:

> In accordance with the relevant internal rules as well as laws and regulations, all organizational units are required to properly retain and manage materials used by decision-making bodies, minutes of meetings, and other information needed for the execution of duties by Members of the Board of Directors. TMC has established global systems and mechanisms for addressing full range of information security issues, including the management of confidential information, and regularly conducts inspections of progress being made in this regard by TMC and its subsidiaries.

98. To ensure employee conduct is in compliance with laws and regulations, the Company declared that:

> TMC has been providing education to a wide range of employees including newly hired employees to ensure that all employees acquire basic knowledge about compliance so as to improve compliance awareness throughout the Company. Each organizational unit inspects its compliance framework in its key risk areas and undertakes efforts to make improvements. The outcome of these efforts is reported at Sustainability Meetings.

99. In addition, Toyota "established a hotline called 'Toyota Speak Up Line' to enable employees to consult with outside attorneys or the relevant internal persons in charge about problems and questions concerning compliance. TMC (secretariats and relevant organizational units) conducts investigations of the facts and takes necessary measures once informed of an issue. The details of these consultations and outcomes of the measures subsequently taken are reported to the relevant executives at TMC."

100. Toyota also described its procedures for ensuring compliance at its subsidiaries, stating that "TMC examines significant risk areas to ensure that each subsidiary's systems for compliance are adequate and undertakes activities to improve these systems and reports the outcomes of these activities at its Sustainability Meetings, etc." and that "TMC is made aware of problems and questions related to compliance at its subsidiaries through the whistleblower offices established by its subsidiaries and through the whistleblower office that TMC has established outside the company to cover its subsidiaries in Japan. Factual investigations are conducted by subsidiaries and relevant divisions of TMC, and necessary measures, including corrective measures and reporting to relevant executives, are taken."

101. Further supporting an inference of scienter is the fact that, on April 28, 2023, Toyoda promised to personally oversee programs to address testing misconduct, stating that as "Chairman of the Board and with my recall issue experience, [I] will lead initiatives for governance and compliance."

102. Moreover, Defendant Toyoda admitted to being aware of misconduct at Toyota subsidiaries long before it was disclosed to the public. Specifically, Toyoda admitted, during a January 30, 2024 press conference, posted on Toyota's website "The Toyota Times" that, "[i]n the case of Hino, for instance, the public

announcement came more than a year after I learned about the situation. Daihatsu took about six months, and Toyota Industries around ten months."

103. During that same January 30, 2024 press conference, when asked about the causes of the successive irregularities uncovered within the Toyota Group, Toyoda confirmed his familiarity with the investigation into the irregularities, referring to third-party committee reports on the subjects and stating that he had "been briefed by people who verified it."

104. Further supporting an inference of each of the Individual Defendant's scienter is Defendant Toyoda's admission in an interview published on The Toyota Times on June 17, 2024, that Toyota attempted to avoid admitting to wrongdoing in responding to the certification scandal. Contrasting their handling of the certification scandal with an earlier scandal of a Prius breaking defect, Toyoda stated that "in this case, our strategy was to avoid fanning the flame of unnecessary concern with phrases like 'false statements' or 'wrongdoing.'" Elsewhere in the same interview, Toyoda stated that " I shouldn't really say this, but when people hear 'wrongdoing' or 'false statements,' they imagine something terrible."

105. Further supporting each Individual Defendant's scienter is the fact that Toyota's board of directors paid close attention to the ongoing certification scandal. According to Toyota's Report on Corporate Governance filed as an exhibit to a Current Report on Form 6-K, on June 24, 2024, certification issues at Toyota Subsidiaries and the Toyota Group were discussed at board meetings more than 20 times in Fiscal 2024. "In addition, Outside Members of the Board of Directors and the Audit & Supervisory Board and operating members intensively discussed governance measures for TMC, its subsidiaries, and the Toyota Group, and summarized them into a corporate culture, mechanisms, and systems. The details were reported and discussed at a meeting of the Board of Directors."

## IX. PLAINTIFFS' CLASS ACTION ALLEGATIONS

106. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased or otherwise acquired publicly traded Toyota securities on domestic exchanges or in domestic transactions during the Class Period, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

107. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on domestic exchanges, including the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

108. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

109. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

110. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

(c) whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false filings;

(f) whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

111. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

112. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) the Company's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

(b) as a public issuer, the Company filed periodic public reports with the SEC;

(c) the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period, with an average of more than 300,000 shares trading per day; and

(e) the Company was followed by roughly 150 securities analysts who wrote reports that were widely distributed and publicly available.

113. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

114. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## X. CLAIMS FOR RELIEF

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**

**(Against All Defendants)**

115. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

116. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

117. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

118. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

119. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially

participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

120. The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiffs and the Class.

121. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

122. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

123. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

124. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**

**(Against the Individual Defendants)**

125. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

127. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

128. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of

operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

129. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(A) declaring this action to be a proper class action, designating Additional Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(B) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(C) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

//

//

Dated: February 14, 2025

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*

Adam M. Apton (316506)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel.: (213) 985-7290
Email: aapton@zlk.com

*Lead Counsel for Plaintiffs and the Class*

**THE ROSEN LAW FIRM, PA**

Laurence Rosen
Jonathan Stern (*pro hac vice* application forthcoming)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel.: (212) 686-1060
Email: jstern@rosenlegal.com
Email: lrosen@rosenlegal.com

*Additional Counsel for Plaintiffs*

**THE SCHALL LAW FIRM**

Brian Schall (290685)
Brian R. England (211335)
Rina Restaino (285415)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel.: (310) 301-3335
Email: brian@schallfirm.com
Email: rina@schallfirm.com

*Additional Counsel for Plaintiffs*